FILED
11/28/2022
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 2, 2022

IN RE MELVIN M. ET AL.

Appeal from the Juvenile Court for Davidson County
No. PT260263, 2019-000288, 2019-000289    Sheila Calloway, Judge
_____

No. M2021-01319-COA-R3-PT
_____

A father appeals the termination of his parental rights to his two children. The juvenile court concluded that there was clear and convincing evidence of five statutory grounds for terminating his parental rights. The court also concluded that there was clear and convincing evidence that termination of the father's parental rights was in the children's best interest. On appeal, although we conclude that there is not clear and convincing evidence to support three of the grounds, clear and convincing evidence supports the remaining grounds for termination and the best interest determination. So we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON II, J., joined.

C. Michael Cardwell, Nashville, Tennessee, for the appellant, Max S.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

The Department of Children's Services ("DCS") received a referral, in December 2018, about a drug-exposed newborn. The baby boy's umbilical cord screen was positive for buprenorphine, cocaine, and methamphetamine. His mother ("Mother") tested positive for buprenorphine, amphetamine, and methamphetamine. She also admitted to illegal use of Subutex for three years and use of methamphetamine two days before the child was

born. The child's father, Max S. ("Father"), denied drug use but tested positive for methamphetamine and amphetamine.

An immediate protection agreement was entered, and the baby boy and his three-year-old sister were removed due to the parents' substance abuse and the abuse of the baby boy occasioned by mother's drug use. DCS placed the children with a family member. But nine months later, on August 1, 2019, the children were removed from the family placement due to drug use.

Because Mother could not be reached and Father was in jail, DCS petitioned the juvenile court for custody and to adjudicate the children dependent and neglected. Ultimately, in December 2019, Mother and Father agreed that the children were dependent and neglected due to Mother's and Father's substance abuse and the abuse to the baby boy resulting from Mother's drug use while pregnant. DCS placed the children in foster care.

On November 3, 2020, DCS petitioned to terminate Father's parental rights.[1] The petition alleged the following grounds against Father: (1) abandonment by failure to provide a suitable home; (2) abandonment by incarcerated parent by wanton disregard; (3) substantial noncompliance with the permanency plan; (4) persistent conditions; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume custody.[2]

Three witnesses testified at trial: the family services worker (the "FSW"), the children's foster mother, and Father. By the time of trial, the children had been in DCS custody continuously for just over two years. The FSW explained that a family permanency plan had been developed in October 2019 with the goal of returning the children to a parent or for the children to exit custody with a relative.

Father was present for the initial permanency plan meeting and when his tasks under the plan were discussed. His most important tasks were to stay free from criminal activity, remain drug free, and find stable housing. But, according to the FSW, Father had made no progress on the plan because he had been in jail for much of the time. Father had not supported the children financially or visited with the children since they entered foster care. On cross-examination, the FSW conceded that Father had seen the children in October 2019 at a court hearing and at a child and family team meeting.

The FSW visited with the children once or twice a month at their current foster care placement. The children called the foster parents "Mom" and "Dad." And they ran to the foster parents for comfort. The baby boy, now a two-year-old, was receiving early

---

[1] DCS also sought to terminate the parental rights of Mother. Because Mother has not appealed the termination of her parental rights, we focus on the facts as relevant to Father.

[2] The petition also alleged abandonment by an incarcerated parent by failure to visit and failure to support. But DCS dismissed those grounds at the conclusion of the trial.

intervention therapies, and the foster parents made sure he attended all his appointments. The daughter was also receiving therapy for her mental health. She was having intensive therapy initially. But due to her progress, the frequency of her appointments had lessened. In the FSW's view, changing caregivers would be detrimental to the children because of their strong bond with the foster parents.

The foster mother testified that the children had lived in her home for a little over a year. Their prior foster placement was not a pre-adoptive home. So the two foster families worked together to make the transition as easy as possible for the children.

When the children first came to the current foster family, the son was involved in early intervention therapies and was wearing a helmet. A year later, the son still had early intervention therapy and had added speech therapy. But he graduated from the helmet. The daughter was in kindergarten and very comfortable with the foster parents. She rarely talked about Father. When she talked about her biological mother she called her "Old Mom" or "First Mom."

The foster parents had no other children in their home. The foster mother was a preschool teacher at the preschool the children attended. The foster parents owned their home, and the children had separate bedrooms. The foster mother said that the children were "[her] babies" and that they were "a family" that loved each other. Her long-term vision for the children was for them to grow up mentally and physically healthy and to be kind, loving, hard-working, independent adults. The foster parents planned to adopt the children.

Father testified from the Wilson County jail. Father was also in jail when the children were originally removed in August 2019. He was out of jail for the months of September and October 2019, then arrested in November 2019 for theft. He remained in jail from that time until March 2020. He was out of jail again March through May 2020. His most recent incarceration stemmed from violating an order of protection and the sale of Schedule II drugs.

During the two months he was free in September and October 2019, Father attended a child and family team meeting where he discussed the permanency plan and services available to him. But, he was arrested again before he could set up visitation. Father maintained that, during the months he was out of jail, DCS did not provide any services to assist him with completing the steps in the permanency plan.

Father was told that he must come to a child and family team meeting before he could have visitation. After the meeting, DCS did not contact Father to schedule visitation with the children. But Father also admitted that he did not contact DCS. To further complicate matters with visitation, Mother's order of protection against Father prohibited him from visiting the children while Mother was present.

3

While in jail, Father had not been able to participate in any improvement classes because they were not offered during COVID. Shortly before trial, Father started a correspondence program that included classes on self-behavior, parenting, and drugs and alcohol. He had completed the self-behavior class. After his release, which he hoped would be in October 2021, Father planned to go to a halfway house. He was "pretty sure" the children could live with him in the halfway house.

Father said he engaged in criminal activity because he could not find a job during COVID. He also blamed a drug relapse. According to Father, he had experienced drug problems for "probably about four years." He attempted rehabilitation once, but did not finish because he relapsed. The last time he saw either of his children was in October 2019.

The juvenile court terminated both Mother's and Father's parental rights. As to Father, the court concluded that there was clear and convincing evidence of five statutory grounds for termination: (1) abandonment by failure to provide a suitable home; (2) abandonment by wanton disregard; (3) substantial noncompliance with the permanency plan; (4) persistent conditions; and (5) failure to manifest an ability and willingness to assume custody. It found that DCS had not proven severe child abuse by Father. The juvenile court also concluded that there was clear and convincing evidence that termination of Father's parental rights was in the children's best interest.

## II.

A parent has a fundamental right, based in both the federal and state constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. The government's interest in the welfare of a child justifies interference with a parent's constitutional rights in certain circumstances. *See* Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Parties seeking termination of parental rights must first prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). If one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and

the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

We review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); TENN. R. APP. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

A.

On appeal, Father challenges each of the grounds for terminating his parental rights and the best interest determination. DCS concedes on appeal that the ground of abandonment by failure to provide a suitable home was not proven. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(ii) (Supp. 2020); 36-1-113(g)(1). And we agree. Much of the circumstances surrounding the placement of the children with a relative is not apparent from the record. *See id.* § 36-1-102(1)(A)(ii)(a) (providing that, for the ground to apply, the children must have been "placed in the custody of [DCS] or a licensed child-placing agency"). Given DCS's concession and the record, we focus on the remaining four grounds the court relied on for terminating Father's parental rights.

1. Abandonment by Wanton Disregard

The court found Father had abandoned the children under a definition of "abandonment" applicable to parents who were incarcerated when the petition to terminate was filed or at any point during the four-month period preceding the filing of the petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv). When DCS filed its petition to terminate, the incarcerated or formerly incarcerated parent was deemed to have abandoned his child if, among other things, he "ha[d] engaged in conduct prior to incarceration that exhibit[ed] a wanton disregard for the welfare of the child." *Id.* § 36-1-102(1)(A)(iv).

5

Regarding Father's conduct, the court found that he

> continu[ed] to engage in criminal behavior after the birth of both of his children. [F]ather has been incarcerated the majority of the children's lives for charges relating to possession of methamphetamine, violation of probation, failure to appear, criminal impersonation, possession of drug paraphernalia, driving on a revoked driver's license, domestic aggravate[d] assault, simple possession, unlawful possession of a weapon, violation of conditions of release, violation of an order of protection, evading arrest, and violation of a restraining order. [F]ather has only been out of jail for a period of about three (3) months during the children's entire custodial episode. [F]ather has had no contact with the children since 2019.

The trial court determined that this conduct exhibited wanton disregard for the children's welfare.

"Wanton disregard" is not a defined term. Acts amounting to wanton disregard typically "reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015). So "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). But the actions constituting wanton disregard must have occurred at a point in time when the parent had knowledge of the child's existence, which can include "a child *in utero*." *In re Anthony R.*, 2015 WL 3611244, at *3.

Clear and convincing evidence supports the court's finding that Father's conduct exhibited wanton disregard for the children's welfare. Father had an extensive history of criminal acts and substance abuse. He was incarcerated almost the entirety of Mother's pregnancy with Max in 2018. Father was released about the time of Max's birth. But then he "just started using again" with people in the house where Mother was living. In 2019, he pleaded guilty to drug possession, theft, and probation violations. After being released sometime in March of 2020, he returned to drug use. As Father explained, "COVID was going on, so [he] couldn't find a job." And he relapsed. A few months later, he pleaded guilty to violating the order of protection taken out by Mother, evading arrest, and possession of drug paraphernalia. On the way into jail, he was charged with the introduction of contraband into the jail, a charge to which he would later plead guilty. Because of his incarcerations, he was unable to have contact with his children for two years.

6

Father attributed his criminal behavior to his "drug problem," which he had struggled with for "probably about four years." And, at trial, he admitted that he had "chose[n] drugs over [his] own family."

## 2. Substantial Noncompliance with the Permanency Plan

Another ground for termination is "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Father's permanency plan required him to: (1) clear criminal charges and contact DCS upon release; (2) submit to random drug screens; (3) complete a mental health assessment and follow recommendations; (4) complete an alcohol and drug assessment and follow recommendations; (5) sign a release of information; (6) complete a parenting assessment and follow recommendations; (7) complete a domestic violence education program and follow recommendations; (8) have a minimum of four hours of monthly supervised visits; and (9) provide DCS proof of housing and income.

There is only one requirement listed that Father would be able to complete during the more than two years he was incarcerated, sign a release of information. Father testified that there were no services at the jails during COVID, so he was unable to complete the required assessments and programs. He was unable to have supervised visits, submit to random drug screens, or provide DCS with proof of housing and income.

A parent's incarceration does not excuse his responsibility to fulfill the requirements set out in a permanency plan, but incarceration is a "relevant consideration when judging that parent's ability to fulfill his . . . responsibilities to the child." *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638 at *13 (Tenn. Ct. App. Feb. 20, 2015). We have said that, when a parent is incarcerated and the ground of substantial noncompliance with the permanency plan has been alleged, it is important to "avoid making incarceration solely on its own into a de facto ground for termination." *Id.* We conclude that in this case, Father was unable to meet many of the requirements of the permanency plan because of his incarceration and the lack of services provided in the jails during COVID. *See In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *9 (Tenn. Ct. App. Jan. 29, 2018); *In re Jonathan F.*, 2015 WL 739638 at *13. To find that Father did not substantially comply would be tantamount to terminating his parental rights based solely on his incarceration.

## 3. Persistent Conditions

The juvenile court also found termination of parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(3), a ground commonly referred to as "persistence of conditions." *See In re Audrey S.*, 182 S.W.3d at 871. This ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *Id.* at 874. So the question before the court is "the likelihood that

the child can be safely returned to the custody of the [parent], not whether the child can safely remain in foster care." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).

There are several elements to the ground of persistence of conditions. Persistence of conditions may be a basis to terminate parental rights when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A). Each of the statutory elements must be established by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 550.

The trial court concluded that the children had been removed from Father's custody for six (6) months at the time the petition was filed. The court then said:

> The conditions that led to the removal still persist and other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the children. These conditions include: [Mother and Father] continue to abuse illicit substances; [Mother and Father] are consistently incarcerated due to their ongoing criminal activity; there is ongoing domestic violence between [Mother and Father]; [Mother and Father] have not exercised regular visitation with the children; [Mother and Father] have not completed the tasks on the permanency plan; Respondents have not addressed their substance abuse issues; [Mother and Father] have taken no steps to address their parenting skills or concerns for their ability to keep the children safe; [Mother and Father] are not compliant with the tasks

8

related to addressing mental health concerns; [Mother and Father] have demonstrated no ability or willingness to care for their children; and [Mother and Father] have abandoned the children to the foster care system.

There is no dispute that at the time of trial, the children had been removed from Father's custody for well over six months. *See* Tenn. Code Ann. § 36-1-113(g)(3)(B) ("The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard."). But, as to Father, we conclude that this ground was not proven by clear and convincing evidence.

Beyond the children having been removed for over six months, there was little evidence offered concerning the other elements of the persistence of conditions ground. The juvenile court's findings focus almost entirely on Father's past history and his failure to carry out various tasks listed on the permanency plan. The court did not address the results, if any, of Father's claimed efforts to improve. *See In re Audrey S.*, 182 S.W.3d at 874.

4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility for the Children

Finally, the court found termination of Father's parental rights appropriate under Tennessee Code Annotated § 36-1-113(g)(14). Under this ground, a parent's rights may be terminated if he or she

[1] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and [2] placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). Both prongs must be established by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). As to the first prong, the petitioner may prove that a parent is either unable or unwilling to "assume legal and physical custody or financial responsibility for the child." *Id.* at 677.

Clear and convincing evidence shows Father's lack of an ability and willingness to assume custody and financial responsibility of the children. Since August 2019, when the children first came into DCS custody, Father had been incarcerated all but two months. And his potential release date was not until October 2021 at the earliest. Father stated that, during COVID, he turned to criminal activity because he could not find a job. Father also had a drug problem for at least four years and was unable to finish a rehabilitation program because he relapsed. Father acknowledged he was not prepared to care for these children.

9

The evidence is equally clear and convincing that placing the children in Father's custody would pose a risk of substantial harm to their psychological welfare. At the time of trial, Father had not visited with the children since August 2019. And when the children were originally taken from Mother and Father for a family placement, the son was a newborn baby and the daughter was three years old. At this point, Father has been absent from the children's lives for so long, he is a stranger. Returning children to the custody of a virtual stranger carries a risk of substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (reasoning that returning the child to a "virtual stranger" in light of her strong bond with her current caregivers would constitute substantial harm).

B.

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). At the time DCS filed its petition to terminate, Tennessee Code Annotated § 36-1-113(i) listed nine factors for courts to consider in a best interest analysis. The "factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682. The best interest analysis is a fact-intensive inquiry, and each case is unique. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004).

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent." Tenn. Code Ann. § 36-1-113(i)(1). The court found that Father had not made enough progress on his permanency plan to support the application of this factor. So the court weighed this factor in favor of termination.

Similarly, the second factor considers the parent's potential for lasting change "after reasonable efforts by available social services agencies." *Id.* § 36-1-113(i)(2). The trial court concluded that DCS made reasonable efforts given the circumstances. Father was unable to access services while in jail, and they were unable to help him. The plan required Father to alert DCS when he was released from jail, but he testified that he did not contact anyone from March through May 2020, the months he was out. And Father made no effort to reach out to check on the children.

The court addressed the third and fourth best interest factors, which focus on the parent's relationship with the child, together. The third factor considers the consistency of visitation. *Id.* § 36-1-113(i)(3). The fourth factor asks "[w]hether a meaningful relationship has otherwise been established between the parent . . . and the child." *Id.* § 36-

10

1-113(i)(4). Here, Father had no relationship with the children. The son was taken from Father's custody when he was days old, and the daughter was taken when she was three years old. Father had not seen the children since October 2019. He did not testify to any attempts to see the children when he was out of jail.

The fifth factor considers the effect a change in caregivers would have on the child's emotional, psychological, and medical condition. *Id.* § 36-1-113(i)(5). If the children were returned to Father's custody, they would be living with a stranger. The FSW testified that a change in caregivers would be detrimental to both children.

The sixth factor asks whether the parent "has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child." *Id.* § 36-1-113(i)(6). The children were removed from Father and Mother because the son was born with drugs in his system. Both Mother and Father tested positive for the same drugs that were in the baby's system. The court found this was evidence of neglect on the part of Father and Mother. The evidence does not preponderate against this finding.

The seventh factor looks to see whether the parent's home environment is healthy and safe. *Id.* § 36-1-113(i)(7). At the time of trial, Father had no home because he was incarcerated. Father's home before the children were taken into custody was clearly unhealthy for the children. There was domestic violence and drug use. After his release from jail in March 2020, Father quickly returned to jail for violating Mother's order of protection against him and selling Schedule II drugs. Since the children's removal, Father had not demonstrated he could create a healthy and safe environment for the children.

The eighth factor evaluates whether the parent's mental or emotional status prevents proper parenting. *Id.* § 36-1-113(i)(8). The court determined that this factor weighed in favor of terminating Father's rights. Father struggled with a drug addiction for many years. He attempted rehabilitation, but he was unable to successfully complete the program. Mother also obtained an order of protection against him, and Father eventually went to jail for violating the order of protection.

Lastly, the ninth factor examines the parent's child support history. *Id.* § 36-1-113(i)(9). Father did not pay child support during his time in and out of jail.

As an additional consideration, the court found that Father had shown little interest in the welfare of his children and had made lifestyle choices that prevented him from providing a safe home for the children. The court also found that there was a strong bond between the children and the foster parents.

Here, the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the children's best interest. At the time of the trial, the children had been in either a family placement or foster care for almost three years. The

11

court concluded that "[t]he children need[ed] to be released from the stigma of being in foster care." And the foster parents, who wished to adopt, gave the children the earliest possible chance at permanency.

## III.

We affirm the termination of Father's parental rights. The record contains clear and convincing evidence to support two statutory grounds for termination. We also conclude that there is clear and convincing evidence that terminating parental rights was in the children's best interest.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE